UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

RUDOLPH RICHARDSON,                          :

                Plaintiff,            :        15 Civ. 543 (LAK) (AJP)

        -against-                          :    **REPORT AND RECOMMENDATION**

THE CITY OF NEW YORK, NEW YORK CITY :
DEPARTMENT OF CORRECTIONS,
CORIZON HEALTH INC., DR. LANDIS            :
BARNES, CORRECTION OFFICER WILLIAM
SIMMONS SHIELD NO. 18534, CORRECTION :
OFFICER LUIS GARCIA SHIELD NO. 18776,
and CAPTAIN WALKER SHIELD NO. 1023,    :

                Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Lewis A. Kaplan, United States District Judge:**

            Plaintiff Rudolph Richardson (represented by counsel) brings this action against the

City of New York, the New York City Department of Corrections ("DOC"), Corizon Health, Inc.,

Dr. Landis Barnes, Correction Officers William Simmons and Luis Garcia and Captain Lamesha

Walker.  (Dkt. No. 16: Am. Compl. ¶¶ 2-6.)  Richardson alleges, <u>inter alia</u>, that defendants were

deliberately indifferent to his medical needs in violation of his Fourteenth Amendment rights (Am.

Compl. ¶¶ 28-30), committed medical malpractice (Am. Compl. ¶¶ 31-36), and were negligent (Am.

Compl. ¶¶ 54-58).

            Presently before the Court is defendants' summary judgment motion.  (Dkt. No. 45.)

For the reasons set forth below, defendants' motion should be <u>DENIED</u> as to Richardson's deliberate

indifference and medical malpractice claims against Dr. Barnes and Corizon, and his negligence

claim against Officers Garcia and Simmons, but <u>GRANTED</u> in all other respects.

<u>FACTS</u>

On January 26, 2015, Richardson filed his initial complaint, which arises out of an incident in which Richardson was injured while in pretrial detention in DOC custody.   (<u>See</u> Dkt. No. 1: Compl.)  On April 13, 2015, Richardson filed the operative amended complaint.  (Dkt. No. 16: Am. Compl.)  Richardson alleges a total of eight causes of action against the City of New York, DOC, Correction Officers Garcia and Simmons, Captain Walker, Dr. Barnes, and Corizon Health, which provided medical services to DOC inmates and employed Dr. Barnes.  (<u>See</u> Am. Compl. ¶¶ 2-7, 28-65.)  On September 1, 2015, after the close of discovery, defendants filed the present summary judgment motion.  (Dkt. No. 45: Summary Judgment Motion.)

**<u>Richardson's Injury</u>**

On June 4, 2014, Richardson was in pretrial detention at the Manhattan Detention Complex ("MDC").  (Dkt. No. 47: Defs. 56.1 Stmt. ¶ 3; Dkt. No. 56: Richardson 56.1 Stmt. ¶ 3.) That evening, while in the common "'day room'" area of his housing dormitory, Richardson requested permission from Correction Officer Garcia to return to his locked cell to use the bathroom. (Defs. & Richardson 56.1 Stmts.  ¶ 4.)  Richardson received permission to return to his cell.  (Dkt. No. 49: Eison Aff. Ex. C: Richardson Dep. at 40.)[1/]  MDC cell doors are kept locked when detainees are confined to their cells and when they are in the day room or otherwise outside of their assigned cells.  (Defs. & Richardson 56.1 Stmts.  ¶ 6.)  Detainees may elect to use the day room when the cell doors are opened for fifteen minutes each hour, after which the cell doors are closed and locked.

---

[1/]    Because defendants submitted the entire Richardson deposition transcript, while Richardson has only submitted excerpts (Dkt. No. 55: Richardson Br. Ex. 2), the Court will cite to the complete transcript attached to the Eison Affidavit.

(Id.)  Richardson was familiar with this procedure.  (Id.)  Officers open and close the cell doors by pushing a button on the control panel.  (Defs. & Richardson 56.1 Stmts. ¶ 7.)

Richardson's cell was located above the level of the day room area, and by the time he reached it, an officer already had opened the door.  (Defs. & Richardson 56.1 Stmts. ¶¶ 9-10.) After Richardson sat down on the toilet adjacent to the wall with the cell door, he pushed the door closed, leaving it slightly ajar, but the door slid to a fully closed position.  (Defs. & Richardson 56.1 Stmts. ¶ 11.)  While sitting on the toilet, Richardson did not observe anything unusual about his cell door's operation.  (Defs. & Richardson 56.1 Stmts. ¶ 12.)  Richardson braced himself by placing his left hand on the closed cell door.  (Defs. & Richardson 56.1 Stmts. ¶ 13.)  Richardson testified that prior to his accident, he had never seen the cell doors opened all the way (Richardson Dep. at 49), although he also testified that he was aware of the movement and speed of the doors when opening and closing (id. at 39-41).

While Richardson was using the toilet in his cell, C.O. Garcia learned that bail was posted for Richardson and two other detainees.  (Defs. & Richardson 56.1 Stmts. ¶ 14.)  C.O. Garcia called out the three names, but Richardson did not hear his name called because he was in his cell with the door closed.  (Defs. & Richardson 56.1 Stmts. ¶¶ 15-16.)  Officer Simmons opened the cell doors for the bailed detainees to allow them to get their belongings from their cells, as well as to allow Richardson to leave his cell.  (Defs. & Richardson 56.1 Stmts. ¶ 18.)

MDC's normal procedure for opening cell doors requires the "B" officer on the floor to announce the opening and closing of cell doors to inmates by yelling out which cells are to be opened; only then does the "A" officer who operates the cell doors from the "bubble" (i.e., the control room) open the door.  (Richardson Br. Ex. 4: Walker Dep. at 14-16; Eison Aff. Ex. G: Garcia

Dep. at 17-18.)[2]  Richardson maintains that the officers did not follow proper protocol in opening

his cell door.  (Richardson 56.1 Stmt. ¶ 17.)  C.O. Garcia did not recall whether the "bubble" officer

had yelled out to the inmates to warn them that the doors were being opened, nor did he claim to

have announced the cell door openings himself.  (Garcia Dep. at 19-26.)  In addition, C.O. Garcia

did not know who told C.O. Simmons to open the cell doors and testified that Richardson's door was

already being opened by the time C.O. Garcia was in the middle of the tier, calling out the bailed

out inmates' names.  (Garcia Dep. at 19, 25-26.)  Officer Garcia also testified that he could not recall

whether Richardson asked him for permission to return to his cell, but another inmate informed him

that Richardson was in his cell using the toilet (Garcia Dep. at 22), although as the "B" officer, C.O.

Garcia was the only one who could have given Richardson permission to enter his cell (Garcia Dep.

at 22; Eison Aff. Ex. H: Simmons Dep. at 18).  An inmate witness stated that he saw Officer

Simmons repeatedly open and close Richardson's cell door in what the inmate characterized as an

attempt to get Richardson's attention.  (Richardson Br. Ex. 6: Inmate Voluntary Stmt.)  C.O.

Simmons testified that he opened the door only once.  (Simmons Dep. at 19.)

According to Richardson, his cell door opened three times in quick succession,

unexpectedly trapping his finger in the door's mechanism the third time:

> It opened a few times I remember.  The first time it opened real quick and closed.
> The second time it opened halfway, it closed, then the last time, again, my hand was
> against the door and it opened all the way and I thought it would maybe -- I was
> thinking that it would close -- I mean it will open and close like the first two times,
> but it continued closing and, again, my hands were next to the groove . . . .  It
> continued opening the third time and it did not close like normal like the first two

---

[2]   According to Captain Walker, MDC has policies and procedures in place for how to respond
in case an inmate "gets his hand stuck in the slider" because it has happened before, although
he "couldn't tell you how many times."  (Walker Dep. at 12-13.)  These procedures include
generating an injury report, generating an infraction, and quickly taking the inmate to the
clinic.  (Id.)

> times and that is when I felt the surge of pain and I immediately began to try to pull my finger or my hands -- I didn't even realize that my finger was being crushed with the door as it opened all the way, so I just began to pull and as I pulled . . . the pain finally registered and a piece of the finger was left in the door.

(Richardson Dep. at 51.)  At deposition, Richardson stated that he did not know how his finger slid with the door (Richardson Dep. at 51-52), but also testified that when the accident occurred, "[i]t happened just so fast that soon as it began to open, I felt that my finger was being pulled with it and, you know, pain just came out of nowhere, and I began pulling my hand out and it continued to . . . . open as I'm pulling my finger out" (id. at 54).

Richardson was injured at approximately 6:40 p.m.  (Defs. & Richardson 56.1 Stmts. ¶ 23.)  Richardson wrapped his injured finger in a towel, left his cell to walk to the day room area, and explained his injury to C.O. Garcia.  (Defs. & Richardson 56.1 Stmts. ¶¶ 23-25.)  C.O. Garcia reported the incident to C.O. Simmons, who called for an escort officer to take Richardson to the clinic for treatment.  (Defs. & Richardson 56.1 Stmts. ¶ 26.)  Officer Simmons also notified Captain Walker, who arrived in the housing unit after Richardson was taken to the clinic.  (Defs. & Richardson 56.1 Stmts. ¶ 27.)  Before the escort officer arrived, Officer Garcia retrieved the severed tip of Richardson's finger and kept it cold with a cold pack or by placing it in the refrigerator.  (Defs. & Richardson 56.1 Stmts. ¶ 28.)

**Richardson's Medical Treatment**

Richardson arrived at and was logged into the MDC clinic by 6:55 p.m.  (Dkt. No. 47: Defs. 56.1 Stmt. ¶ 29; Dkt. No. 49: Eison Aff. Ex. M: Clinic Log Book.)  Richardson was treated by Dr. Barnes, a physician board certified in internal medicine, who began by recording Richardson's vital signs.  (Defs. 56.1 Stmt. ¶ 30; Dkt. No. 56: Richardson 56.1 Stmt. ¶ 30.)

Defendants claim that "[a]fter Dr. Barnes was shown the severed piece of

[Richardson's] fingertip, he informed [Richardson] that the tip could not be surgically reattached and, therefore, that it could be discarded." (Defs. 56.1 Stmt. ¶ 32.) Richardson, however, asserts that "Dr. Barnes did not qualify Mr. Richardson's amputation as a severed tip. He improperly thought it was only Mr. Richardson's fingernail." (Richardson 56.1 Stmt. ¶ 32.) MDC medical records show that Dr. Barnes diagnosed Richardson with an avulsed fingernail. (Eison Aff. Ex. E: MDC Med. Records at D000130.) Dr. Barnes testified that Richardson "had an avulsion of the fingernail" and that he told Richardson "'[t]he fingernail is normally not salvageable.'" (Eison Aff. Ex. O: Barnes Dep. at 47-49.) Richardson objected to discarding the severed fingertip, and insisted on taking it with him to the hospital. (Defs. & Richardson 56.1 Stmts. ¶ 33.) Dr. Barnes provided Richardson with a container and saline solution. (Defs. & Richardson 56.1 Stmts. ¶ 34.)

Dr. Barnes' treatment plan was for Richardson to be transported to Bellevue Hospital on a "'three-hour run'" for evaluation and treatment by a hand surgeon. (Defs. & Richardson 56.1 Stmts. ¶ 39; Barnes Dep. at 46-48.) A "three-hour run" means that DOC would transport Richardson to Bellevue within three hours. (Defs. & Richardson 56.1 Stmts. ¶ 40.) Dr. Barnes could have ensured that Richardson was transported to Bellevue immediately after treating his finger but did not. (Barnes Dep. at 74.)

Dr. Barnes began bandaging Richardson's injured finger, but Richardson complained that this caused him further pain and objected to how Dr. Barnes was wrapping the wound. (Defs. & Richardson 56.1 Stmts. ¶ 35.) Richardson told Dr. Barnes that he wanted to write a statement about the incident. (Richardson Dep. at 66-67.) Richardson testified that at this point, Dr. Barnes told him that he could be on his way to Bellevue in ten minutes if he did not write a report, but that "if you choose to write a statement you are going to be here for four hours." (Id.) Richardson further testified that Dr. Barnes' "mood completely changed. Initially he seemed like he was going

to treat my finger, but as soon as I said that I was going to write a statement he became very belligerent with me." (Id. at 67.)  Finally, Richardson claims that while Dr. Barnes was wrapping his injured finger and in response to his wish to write a statement, Dr. Barnes squeezed Richardson's injured finger "to the point where he was causing more harm than good." (Id. at 68-69.)  Dr. Barnes claims that he bandaged Richardson as gently as he could.  (Barnes Dep. at 66.)  Dr. Barnes also denies that he told Richardson that if Richardson filled out an incident report, he would be at the facility longer.  (Id. at 71.)  In any event, Richardson completed bandaging his finger himself. (Defs. & Richardson 56.1 Stmts. ¶ 36.)  Dr. Barnes' evaluation and treatment of Richardson's injury took "less than ten minutes."  (Richardson Dep. at 74.)

After being taken to a locked holding room inside the clinic, Richardson prepared an "'Inmate Voluntary Report '" describing his injury and treatment.  (Defs. & Richardson 56.1 Stmts. ¶¶ 37-38; Richardson Dep. at 65-66; Barnes Dep. at 43; see also Eison Aff. Ex. D: Richardson Stmt. ("Dr. Landis Barnes refused to give me care and had the COs, locked me into a room as I bled from a bad bandage").)  Richardson claims that he began writing his statement at Dr. Barnes' desk, but was locked in a room in the MDC clinic on Dr. Barnes' orders.  (Richardson Dep. at 66.)  According to Dr. Barnes, because Richardson was ready for transport to Bellevue, he released Richardson to correction officers who took Richardson to a holding room, where Richardson wrote his report. (Barnes Dep. at 45-46.)  Dr. Barnes initially testified that Richardson was held in the MDC clinic, but later stated that he did not know where Richardson was taken. (Barnes Dep. at 43, 45.) Richardson spent approximately thirty to forty-five minutes writing his statement. (Richardson Dep. at 73.)

The parties disagree about whether Richardson was "discharged" from the MDC clinic at this point (Defs. & Richardson 56.1 Stmts. ¶ 38; Dkt. No. 60: Defs. 56.1 Counter-Stmt. ¶

38), and about whether Richardson "did not want to leave for the hospital until he completed his report" (Defs. 56.1 Stmt. ¶ 42), or "was sitting in the locked room even after he finished his report" because Dr. Barnes misdiagnosed his injury and did not tell DOC to transport Richardson to the hospital immediately (Richardson 56.1 Stmt. ¶ 42).  Dr. Barnes testified that during this time, Richardson was still his patient.  (Barnes Dep. at 43.)  MDC records show that Richardson was officially discharged at 8:22 p.m., approximately an hour and a half after arriving at the clinic. (Eison Aff. Ex. M: Clinic Log Book.)

While in the MDC clinic, Richardson was offered Motrin for his pain.  (Defs. & Richardson 56.1 Stmts. ¶ 47.)[3/]  After Richardson was taken to the holding room, Dr. Barnes did not provide him with any other treatment, did not check on Richardson or follow up to make sure that Richardson had left for Bellevue, and did not inform him of any other medical risks aside from warning Richardson that his fingernail would not grow back.  (Defs. & Richardson 56.1 Stmts. ¶ 44; Barnes Dep. at 43-44, 71-72.)

Richardson was transported to Bellevue, arriving at 10:06 p.m.  (Defs. & Richardson 56.1 Stmts. ¶ 49.)  Richardson's records from his Bellevue intake identify his chief complaint as a "[l]eft middle digit tip amputation."  (Bellevue Med. Records at 1.)  Richardson reported his level of pain as a nine, which was noted as "[s]evere."  (Id.)

Richardson was treated at approximately 2:00 a.m. by hand surgeon Dr. Olga Solovya. (Defs. & Richardson 56.1 Stmts. ¶ 54; Bellevue Med. Records at 6; Eison Aff. Ex. L: Dr.

---

[3/]     At deposition, Richardson testified that he requested Motrin only once -- from Dr. Barnes, while locked in the holding room writing his statement.  (Richardson Dep. at 65.)  According to Richardson, Dr. Barnes never provided the medication.  (Id.)  Nonetheless, Richardson reported to the Bellevue emergency room staff that he had received Motrin (Eison Aff. Ex. F: Bellevue Med. Records at 1), and does not contest that fact now (Richardson 56.1 Stmt. ¶ 47).

Strauch Expert Report at 2.)  Dr. Solovya's treatment notes state that Richardson's "middle [finger]

was crushed and tip amputated," and refer to his injury as a "traumatic amputation."  (Bellevue Med.

Records at 6-7.)  Richardson claims that the "hand surgeon sutured the fingertip [that] Mr.

Richardson had save[d], to the rest of his finger.  The nail bed was removed from his ring finger and

the fractures were repaired with sutures." (Richardson 56.1 Stmt. ¶ 54.)  In contrast, defendants

describe the treatment as "[t]he surgeon cleaned the subcutaneous fatty and connective tissue from

the avulsed skin, removed the fingernail and used the preserved piece of skin as a cap graft -- i.e.

a biologic bandage -- to cover the wound as it healed."  (Defs. 56.1 Stmt. & Counter-Stmt.  ¶ 54; see

also Eison Aff. Ex. L: Dr. Strauch Expert Report at 2.)  Bellevue's treatment records describe

Richardson's treatment as "[t]ourniquet applied and bone rongeured back.  Amputated fingertip

soaked in betadine and subcutaneous tissue removed.  Fingertip sutured to finger . . . .  Nail was

removed and nailbed irrigated . . . . Nail bed lac repaired . . . ."  (Bellevue Med. Records at 7.)

Richardson described the treatment by the Bellevue doctor as follows:

> She had to inject me with anesthesia and then -- this is while I'm awake -- she began
> to cut away at the flesh around it and also use a plier to cut the bones that were
> sticking out and she used the piece of the finger that I kept.  She used a piece of the
> finger that I kept, she used the skin from the amputated piece and used it as a
> biological wrap around it.  Or a Band-Aid you would say.

(Richardson Dep. at 11-12.)

An x-ray taken at Bellevue revealed a fractured tip and a subungal hematoma in

Richardson's ring finger and a fracture of his middle finger.  (Defs. & Richardson 56.1 Stmts. ¶¶ 52,

58-59.)  The emergency room doctor removed Richardson's fingernail from his ring finger to drain

the hematoma.  (Id.)

The skin sutured on to Richardson's fingertip eventually fell off, as the doctors

anticipated.  (Defs. 56.1 Stmt. ¶ 55; Bellevue Med. Records at 12.)  Richardson claims that his

injured finger became infected twice following the incident, necessitating one trip to the emergency room.  (Richardson 56.1 Stmt. ¶ 55; Richardson Dep. at 16-17.)  Bellevue records from a September 4, 2014 visit by Richardson describe mild pain increasing over the past nine days, no evidence of abscess, and a prescription for Keflex "for possible starting infection."  (Richardson Br. Ex. 7: Bellevue Med. Records at 11.)  Richardson also claims that he was unable to use his hand for "a good seven to eight months" after his injury because of "constant pain" so severe that he "could barely tie [his] shoelace."  (Richardson Dep. at 29.)  Richardson claims that this would have prevented him from performing his job as a military contractor had he been working because the injury would have prevented him holding, aiming or shooting a weapon.  (Id. at 27-30.)

Richardson has had no further surgical procedures on his left hand and has regained full mobility to his injured fingers.  (Defs. & Richardson 56.1 Stmts. ¶¶ 67-68.)  Richardson maintains that his left middle finger is shorter and wider following his recovery than before, while defendants claim that "the fingernail grew back without any deformity and the wound healed." (Compare  Defs. & Richardson 56.1 Stmts. ¶ 56.)  Photographs of Richardson's left middle finger following recovery show that his nail grew back.  (Eison Aff. Ex. P: Post-Recovery Photographs of Richardson's Finger.)   His fingertip appears to be shorter and wider than his left index and ring fingers, with a slightly asymmetrical tip.  (See id.)  The nail on Richardson's ring finger grew back with no disfigurement.  (Defs. & Richardson 56.1 Stmts. ¶ 60.)

**Expert Medical Opinions**

**Dr. Brown**

Richardson's expert Dr. Kevin Brown is a full-time attending physician in the emergency department of Phelps Memorial Hospital Center in Sleepy Hollow, New York.  (Dkt. No. 49: Eison Aff. Ex. J: Dr. Brown Expert Report at 1.)  Dr. Brown also serves as a part-time attending

emergency physician at Bassett Medical Center in Coopertown, New York and Putnam Hospital Center in Carmel, New York.  (Id.)  Dr. Brown's report discusses his extensive qualifications, including "more than forty years caring for traumatic injuries of extremities" and experience as the "director of three emergency departments over a ten-year period."  (Id.)  Dr. Brown reviewed records from DOC and Bellevue, Dr. Barnes' deposition, and color photographs of Richardson's injured hand, and produced a detailed recitation of the case details.  (Id. at 1-3.)  Dr. Brown assessed the medical evidence "based on [his] over forty years of caring for emergent injuries."  (Dr. Brown Expert Report at 3.)

Dr. Brown concluded that Dr. Barnes' treatment of Richardson's injuries deviated from the standard of care in five ways, explaining his reasoning with respect to each.  (Dr. Brown Expert Report at 3-4.)  Specifically, Dr. Brown opined that Dr. Barnes failed to appreciate the severity of Richardson's injuries by misdiagnosing the amputation as an avulsed fingernail, failed to diagnose the fracture in Richardson's left ring finger, failed to provide proper care for the amputated fingertip, delayed the reattachment of Richardson's finger "by ordering that 3-hours was an appropriate timeframe for transportation to Bellevue" instead of ordering immediate transportation, and failed to provide appropriate pain relief to Richardson.  (Id.)  Dr. Brown noted that "[a]n amputation is a serious injury by any consideration."  (Id. at 3.)  He noted that "[i]n Mr. Richardson's case, the nail was not avulsed as the mechanism of the injury was not a tangential lifting force resulting in a separation of the nail from the nail bed -- but rather a crushing force as caused by a closing cell door" which resulted in  Richardson's finger being "crushed and severed from the remainder of the proximal finger portion."  (Id. at 4.)  Dr. Brown concluded that these "departures from acceptable emergency care led to subsequent complications and long-term complications."  (Id.)

At deposition, Dr. Brown conceded that he could not identify with "certainty" any adverse consequences from the delay in Richardson's treatment.  (Eison Aff. Ex. K: Brown Dep. at 57.)  Nonetheless, Dr. Brown identified ischemia (i.e., decreased bloodflow) as a complication that occurred.  (Id. at 51.)  He also identified pain and infection of the injured finger as potential consequences of the delay in treatment.  (Id. at 43, 51.)  Dr. Brown acknowledged that Richardson received a cap graft at Bellevue (id. at 33), but opined that had the cap graft taken, Richard probably would have had improved sensation post-recovery and less pain (id. at 51).

Dr. Brown also testified that although Bellevue's emergency room apparently never considered performing a surgical reattachment of Richardson's finger, the window for doing so typically would have been "one to two hours." (Brown Dep. at 32-34.)  According to Dr. Brown, properly preparing Richardson's severed fingertip "would have improved his chance of having a good attachment." (Id. at 42.)  If the cap graft that Richardson received failed, Dr. Brown opined that "there could have been infection as a result of it.  It would have sloughed off.  He might have had more pain with it." (Id. at 43.)  Dr. Brown stated that whereas for a fingernail avulsion, "you could get there ten hours later," a fingertip amputation is "a time-sensitive injury" and that Dr. Barnes' failures to "properly prepare" the severed fingertip and to have Richardson transported to Bellevue "in a timely fashion" were "poor medical care." (Id. at 48-49.)  Finally, Dr. Brown testified that while he could not entirely rule out malpractice at Bellevue as a potential cause, he did not see any reason to blame them and knew that "clearly there was a delay in transporting [Richardson] to the hospital and a delay . . . or an inadequate preparation of the fingertip." (Id. at 52.)

**Dr. Strauch**

Defendants' expert Dr. Robert Strauch is a full-time orthopaedic surgeon specializing in hand surgery at Columbia University.  (Dkt. No. 49: Eison Aff. Ex. L: Dr. Strauch Expert Report

at 1.)  Dr. Strauch has over thirty years of medical experience, has published over 100 peer reviewed articles, and holds a specialized certificate in hand surgery.  (Id.; see also Eison Aff. Ex. L: Dr. Strauch CV.)  In preparing his report, Dr. Strauch reviewed, inter alia, Dr. Brown's report, recent photos of Richardson's hand, Richardson's medical records, and Dr. Barnes' and Richardson's depositions.  (Dr. Strauch Expert Report at 1.)

Dr. Strauch concluded that Dr. Barnes' plan to send Richardson to Bellevue for definitive evaluation and treatment was appropriate.  (Id. at 2.)  In Dr. Strauch's view, "[n]o treatment that [Dr. Barnes] rendered or did not render in no way impacted the clinical outcome of Mr. Richardson's hand injuries.  The time it took to reach Bellevue had absolutely no bearing on Mr. Richardson's clinical result."  (Id.)  Dr. Strauch opined that Richardson suffered two injuries: first, a "a nailplate avulsion of the left middle finger associated with a small piece of avulsed skin" and second, a "[l]eft ring finger subungal hematoma with small distal tuft fracture." (Id. at 2-3.)  Dr. Strauch conceded that Richardson's first injury "technically can be termed a 'distal tip amputation' but is not the type of injury that can be microsurgically replanted."  (Id. at 2.)  Instead, he opined, the three treatment options available were to allow it to heal with only local wound care, to attach a skin graft from some other part of the body, or to "[d]efat the small piece of avulsed skin and reattach as a skin or composite graft (as was done in this case)."  (Id.)  Dr. Strauch also opined that even if Richardson had suffered an amputation closer to the base of the finger, he would have had a twelve hour window in which the severed portion could be reattached were it not placed on ice, or a twenty-four hour window if iced.  (Id. at 3.)  He noted that Richardson reached Bellevue less than four hours after his injury, "which is well under the 12 hour 'warm ischemia' time, had his finger been replantable, which it was not in this case."  (Id.)  Finally, Dr. Strauch opined that Dr. Barnes provided appropriate pain medication to Richardson.  (Id.)

## ANALYSIS

### I.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., 553 F. App'x 13, 14 (2d Cir. 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., 546 F. App'x 53, 54 (2d Cir. 2013); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53; Dolan v. Cassella, 543 F. App'x 90, 90 (2d Cir. 2013).

To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)). Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed." Fed. R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587,

106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[4] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or

---

[4]     See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., 552 F. App'x 47, 49 (2d Cir. 2014); Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g.,

Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

## II. RICHARDSON HAS PRESENTED EVIDENCE THAT DR. BARNES WAS DELIBERATELY INDIFFERENT TO HIS MEDICAL NEEDS[5/]

### A. Legal Standards Governing § 1983 Deliberate Indifference to Medical Needs Claims

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied

a constitutional or federal statutory right and that the deprivation occurred under color of state law.

See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988).  "Section

1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the

deprivation of rights established elsewhere."   Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993)

(citation omitted), cert. denied, 512 U.S. 1240, 114 S. Ct. 2749 (1994).

Richardson was a pretrial detainee at the time of the alleged deliberate indifference,

but "'the standard of review for a Fourteenth Amendment Due Process claim by a pretrial detainee

is identical to an Eighth Amendment claim by a convicted prisoner.'" Stevens v. City of N.Y., 12

Civ. 3808, 2013 WL 81327 at *3 (S.D.N.Y. Jan 8, 2013) (quoting Martin v. City of N.Y., 11 Civ.

600, 2012 WL 1392648 at *8 (S.D.N.Y. April 20, 2012) (citing Caiozzo v. Koreman, 581 F.3d 63,

---

[5/]     Defendants argue that "the medical clinic log records [Richardson's] arrival at 6:55 p.m., fifteen minutes after the incident occurred.  Manifestly, [Officers] Garcia and Simmons did not delay in obtaining medical care for" Richardson.  (Dkt. No. 50: Defs. Br. at 14.)  MDC logs support their contention.  (See page 5 above.)  Moreover, although Richardson's complaint asserts his deliberate indifference claim against all defendants, including the correction officers (Dkt. No. 16: Am. Compl. ¶¶ 29-30), his brief is devoid of any argument that Officers Garcia and Simmons or Captain Walker delayed his treatment, much less that they did so with a state of mind equivalent to criminal recklessness.  (See generally Dkt. No. 55: Richardson Br.)  Because such evidence is required to satisfy the deliberate indifference standard, see cases cited at pages 19-20 below, Richardson's deliberate indifference claim against Officers Garcia and Simmons and Captain Walker should be dismissed.

69 (2d Cir. 2009))), aff'd, 541 F. App'x 111 (2d Cir. 2013).

In order to prevail, Richardson must show that defendants were deliberately indifferent to Richardson's serious medical needs.  See, e.g., Buffaloe v. Fein, 12 Civ. 9469, 2013 WL 3471060 at *1 (S.D.N.Y. July 11, 2013) (Peck, M.J.) (& cases cited therein).

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).[6] "Objectively, the alleged deprivation must be 'sufficiently serious' . . . ." Hathaway v. Coughlin, 99 F.3d at 553; Smith v. Carpenter, 316 F.3d at 183-84 ("The objective 'medical need' element measures the severity of the alleged deprivation . . . .").[7] "'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves . . . .'" Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986).  "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991) (citation omitted); see also, e.g., Dean v. Coughlin, 804 F.2d at 215 ("'[T]he essential test is one of medical necessity and not one simply of desirability.'").  Thus, the constitutional protection is limited to "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" Chance v. Armstrong, 143

---

[6]   Accord, e.g., Fransua v. Vadlamudi, No. 05-1715, 2008 WL 4810066 at *1 (2d Cir. Nov. 3, 2008); Salahuddin v. Goord, 467 F.3d 263, 279-81 (2d Cir. 2006); Smith v. Carpenter, 316 F.3d 178, 183-84 (2d Cir. 2003); Selby v. Coombe, 17 F. App'x 36, 37 (2d Cir. 2001); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).

[7]   See also, e.g., Jones v. Vives, 523 F. App'x 48, 49 (2d Cir. 2013); Fransua v. Vadlamudi, 2008 WL 4810066 at *1; Salahuddin v. Goord, 467 F.3d at 279-81; Selby v. Coombe, 17 F. App'x at 37; Chance v. Armstrong, 143 F.3d at 702.

F.3d at 702;[8/] accord, e.g., Jones v. Vives, 523 F. App'x at 49; Fransua v. Vadlamudi, 2008 WL 4810066 at *1; Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'").

      The Second Circuit has stated that determining whether a deprivation is objectively serious entails two inquiries:

> Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, "prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable . . ." and, conversely, failing "to take reasonable measures" in response to a medical condition can lead to liability.
>
> Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." Thus, although we sometimes speak of a "serious medical condition" as the basis for [such a] claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

Salahuddin v. Goord, 467 F.3d at 279-80 (citations omitted, emphasis added).

---

[8/]    The Second Circuit in Chance v. Armstrong identified several factors that are relevant in determining whether a serious medical condition exists, including "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" 143 F.3d at 702.

Where the plaintiff alleges delay or interruption in treatment rather than failure to receive treatment, "the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." Smith v. Carpenter, 316 F.3d at 186. "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [these] purposes." Id. (citing Chance v. Armstrong, 143 F.3d at 702-03). "The absence of adverse medical effects or demonstrable physical injury is one . . . factor that may be used to gauge the severity of the medical need at issue. Indeed, in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." Smith v. Carpenter, 316 F.3d at 187 (citations omitted).

"Subjectively, the charged official must act with a sufficiently culpable state of mind." Hathaway v. Coughlin, 99 F.3d at 553.[9] "The required state of mind, equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (quotations omitted, quoting Hathaway v. Coughlin, 99 F.3d at 553 (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994))); see, e.g., Caiozzo v. Koreman, 581 F.3d 63, 71 (2d Cir. 2009) (to establish a violation of his Fourteenth Amendment due

----

[9]   Accord, e.g., Jones v. Vives, 523 F. App'x at 50; Fransua v. Vadlamudi, 2008 WL 4810066 at *1; Salahuddin v. Goord, 467 F.3d at 280-81; Smith v. Carpenter, 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); Selby v. Coombe, 17 F. App'x at 37; Chance v. Armstrong, 143 F.3d at 702.

process rights, a plaintiff "must prove, <u>inter alia</u>, that the government-employed defendant disregarded a risk of harm to the plaintiff of which the defendant was aware").[10/]

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials or] guards in intentionally denying or delaying access to medical care." <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. 97, 104-05, 97 S. Ct. 285, 291 (1976) (fn. omitted). However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." <u>Id.</u> at 105-06, 97 S. Ct. at 292; <u>accord</u>, <u>e.g.</u>, <u>Burton</u> v. <u>N.Y.S. Dep't of Corr.</u>, 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. Mar. 21, 1994) (Sotomayor, D.J.). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . ." <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. at 106, 97 S. Ct. at 292.[11/] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. at 106, 97 S. Ct. at 292.[12/]

---

[10/]   See also, <u>e.g.</u>, <u>Jones</u> v. <u>Vives</u>, 523 F. App'x at 50; <u>Sinkov</u> v. <u>Americor, Inc.</u>, 419 F. App'x 86, 89 (2d Cir. 2011) ("evidence 'that [a defendant] <u>should have</u> been aware that [the detainee] was in immediate danger' was insufficient"); <u>Mayo</u> v. <u>Cty. of Albany</u>, 357 F. App'x 339, 341 (2d Cir. 2009) ("A plaintiff bringing a deliberate indifference claim must therefore demonstrate that the defendant deliberately disregarded knowledge of the harm he knew he could cause as a result of his actions."); <u>Ross</u> v. <u>Westchester Cty. Jail</u>, 10 Civ. 3937, 2012 WL 86467 at *5 (S.D.N.Y. Jan. 11, 2012) ("Deliberate indifference is a mental state akin to 'recklessness,' and is measured using a 'subjective test' that discerns whether the defendant was 'actually aware of an excessive risk to an inmate's health or safety,' and therefore 'act[ed] with a sufficiently culpable state of mind.'" (citation omitted)); <u>Mercado</u> v. <u>City of N.Y.</u>, 08 Civ. 2855, 2011 WL 6057839 at *4 (S.D.N.Y. Dec. 5, 2011).

[11/]   Accord, <u>e.g.</u>, <u>Salahuddin</u> v. <u>Goord</u>, 467 F.3d at 280; <u>Hathaway</u> v. <u>Coughlin</u>, 99 F.3d at 553; <u>Felipe</u> v. <u>N.Y.S. Dep't of Corr. Servs.</u>, No. 95-CV-1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr. 10, 1998) (Pooler, D.J.).

[12/]   Accord, <u>e.g.</u>, <u>Smith</u> v. <u>Carpenter</u>, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.");
(continued...)

B.     **Application To Richardson's Claims**

Defendants argue that Richardson cannot satisfy either the objective or subjective prongs of the deliberate indifference standard on the ground that Richardson

> alleges that he was not given treatment by Dr. Barnes, but fails to specify what treatment Dr. Barnes should have provided.  He and his expert point to a delay in transferring him to Bellevue Hospital, complaining that he was kept in a locked room while writing his statement and not given medical treatment.  However, there is no support for these claims.  Dr. Barnes' treatment was complete when he directed DOC to transport [Richardson] to Bellevue Hospital within three hours, which directive was issued after [Richardson's] hand was already bandaged – first by Dr. Barnes and then by [Richardson] himself when he criticized the way Dr. Barnes had wrapped it.  [Richardson] himself elected to delay his transport to the hospital when he chose to write a statement, which took him thirty to forty-five minutes to complete.

(Dkt. No. 50: Defs. Br. at 7, record citations omitted.)  Defendants assert that Richardson can meet neither the objective (id. at 8-12) nor subjective prongs (id. at 12-15) of the deliberate indifference standard.

Because there are factual disputes about the seriousness of Richardson's injuries and Dr. Barnes' state of mind, defendants should be denied summary judgment with respect to Dr. Barnes and Corizon.

1.     **Richardson Has Produced Evidence To Support A Finding That His Amputated Fingertip Was An Objectively Serious Injury**

To satisfy the first prong of the deliberate indifference standard, Richardson must show that the alleged deprivation was objectively sufficiently serious.  Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006); see cases cited at pages 17-18 above.  "Although '[t]here is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition,'

---

12/     (...continued)
Hathaway v. Coughlin, 99 F.3d at 553; Burton v. N.Y.S. Dep't of Corr., 1994 WL 97164 at *2.

[the Second Circuit] has referred to a non-exhaustive list of factors, including: '(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain.'" Rodriguez v. Manenti, 606 F. App'x 25, 26 (2d Cir. 2015) (quoting Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).[13]

Defendants argue that Richardson's injury was not sufficiently serious because it only "consisted of a fingernail avulsion and tearing of a small piece of skin and soft tissue from the tip of the middle finger, along with inconsequential fractures of the tip of his ring and middle fingers" for which Richardson received "appropriate treatment" at Bellevue. (Dkt. No. 50: Defs. Br. at 10.)[14] According to defendants' expert Dr. Strauch, the "treatment [Dr. Barnes] rendered or did not render in no way impacted the clinical outcome of Mr. Richardson's hand injuries" and the "time it took to reach Bellevue had absolutely no bearing on Mr. Richardson's clinical result." (See page 13 above.) Defendants assert that "in his report Dr. Brown sets forth nothing to the contrary" (Defs. Br. at 10.) Defendants further argue that "[t]he gravamen of plaintiff's grievance with defendants appears to be his claim that his treatment was delayed unnecessarily. Even assuming, arguendo, that plaintiff's treatment was delayed, neither plaintiff nor his expert identifies any adverse outcome

---

[13]    Accord, e.g., Poulos v. City of N.Y., 14 Civ. 3023, 2015 WL 3767228 at *5 (S.D.N.Y. June 17, 2015); DeMeo v. Koenigsmann, 11 Civ. 7099, 2015 WL 1283660 at *11 (S.D.N.Y. Mar. 20, 2015); Paul v. Bailey, 09 Civ. 5784, 2014 WL 1807087 at *6 (S.D.N.Y. May 7, 2014), report & rec. adopted, 2014 WL 4694360 (S.D.N.Y. Sept. 11, 2014).

[14]    Defendants also argue that courts have found that a broken finger is not sufficiently serious to meet the objective prong as a matter of law. (Defs. Br. at 10 n.10, collecting cases.) Richardson's claim, however, is based on the amputation of his fingertip combined with undiagnosed fractures. (See pages 4-6, 9 above.) Defendants have not identified any cases holding that such a combination of injuries cannot be sufficiently serious to meet the deliberate indifference standard.

resulting from this delay – that is, a causal connection between the delay and some adverse consequences." (Defs. Br. at 12.)  In support of that position, defendants assert that Richardson "has not lost function in his left hand or fingers and does not even has a cosmetic defect."  (Id.)

Courts in this Circuit have found that severed or amputated digits may be sufficient to support a deliberate indifference claim.  See Orr v. Hoke, 91 Civ. 1256, 1995 WL 217541 at *1, *3 (S.D.N.Y. Apr. 12, 1995) (summary judgment improper in a case where the plaintiff's finger was severed below the nailbed when a cell door closed on it despite a doctor's opinion that the injury was not serious); see also, e.g., Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974) (dismissal of deliberate indifference claim reversed where prison doctor did not reattach a prisoner's severed ear but instead stitched up the wound and threw the severed portion of the ear away); Muhammad v. Unger, No. 98-CV-299, 2002 WL 450010 at *1 (W.D.N.Y. Jan. 9, 2002) ("Defendants do not dispute that the amputation of three of plaintiff's toes is an objectively serious injury and this Court opines that such element of plaintiff's claim is satisfied.").  Richardson's evidence raises a factual issue as to whether his injury was an avulsed nail or a form of amputation.  Although Dr. Barnes only diagnosed Richardson as having an avulsed fingernail (see page 6 above) and Dr. Strauch concurred with that diagnosis (see page 13 above), Richardson's Bellevue intake records identify his chief complaint as a "[l]eft middle digit tip amputation" (see page 8 above).  Similarly, Richardson's hand surgeon's treatment notes state that Richardson's "middle [finger] was crushed and tip amputated" and refer to Richardson's injury as a "traumatic amputation."  (See page 9 above.)  Dr. Strauch concedes that Richardson's injury "technically can be termed a 'distal tip amputation'" (see page 13 above), and never opines that Richardson's injuries were not serious (see generally  Dkt. No. 49: Eison Aff. Ex. L: Dr. Strauch Expert Report).  In contrast, Dr. Brown concluded that Richardson's "nail was not avulsed as the mechanism of the injury was not a

tangential lifting force resulting in a separation of the nail from the nail bed -- but rather a crushing force as caused by a closing cell door" which resulted in the fingernail being "crushed and severed from the remainder of the proximal finger portion," and he opined that an "amputation is a serious injury by any consideration."  (See page 11 above.)  Finally, a photograph of Richardson's injury appears to support his characterization of its seriousness rather than defendants' claim that it was no more than a torn-off fingernail.   (See Dkt. No. 55: Richardson Br. Ex. 12: Photograph of Richardson's Injury.)

Moreover, Richardson testified that he was unable to use his hand for "a good seven to eight months" because of "constant pain" so severe that he "could barely tie [his] shoelace." (See page 10 above.)  According to Richardson, the pain would have prevented him from performing his job as a military contractor had he been working during that time, because it would have prevented him holding, aiming or shooting a weapon.  (See page 10 above.)  Moreover, Dr. Brown opined that the delay in reattaching the amputated portion of Richardson's finger was one of the deviations from the appropriate standard of care and "led to subsequent complications and long-term complications." (See page 11 above.)  Although Dr. Brown conceded that he could not identify with certainty the adverse consequences from the delay in Richardson's treatment (see page 12 above), he nonetheless opined that pain and infection were potential consequences of the delay in Richardson's treatment.  (See page 12 above.)  This is consistent with Richardson's testimony regarding his pain and infections.  (See pages 9-10 above.)

Richardson has presented sufficient evidence to proceed to trial on the objective element of his deliberate indifference claim.

### 2.    Richardson Also Meets The Subjective Requirement

"Subjectively, the charged official must act with a sufficiently culpable state of

mind." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996); see cases cited at page 19 above. This requires a state of mind equivalent to criminal recklessness in which the official knows of and disregards an excessive risk to inmate health or safety, and requires that the official both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and also draw the inference. Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998); see cases cited at pages 19-20 above.

Defendants argue that Richardson "cannot meet the subjective prong of the deliberate indifference analysis, as there is no evidence whatsoever that Dr. Barnes . . . acted in knowing disregard of an excessive risk to [Richardson's] health and safety."  (Dkt. No. 50: Defs. Br. at 12; see also Dkt. No. 59: Defs. Reply Br. at 6-8.)  Dr. Barnes, however, conceded that he was aware Richardson had a serious injury and that Richardson was still his patient when Richardson was writing his report on the incident.  (Dkt. No. 49: Eison Aff. Ex. O: Barnes Dep. at 43.)[15] Nonetheless, after Richardson insisted upon writing a report, Dr. Barnes provided Richardson no further treatment beyond Motrin, did not follow up to make sure that Richardson had left for Bellevue, and warned Richardson only of one medical risk from delaying further treatment -- that his fingernail would not grow back.  (See page 7 above.)  Furthermore, according to Richardson, Dr. Barnes told him that he could be on his way to Bellevue in ten minutes if he did not write a report, but that "if you choose to write a statement, you are going to be here for four hours."  (See page 6 above.)  Richardson further testified that after he said that he intended to file a report, Dr. Barnes' "mood completely changed.  Initially he seemed like he was going to treat my finger, but as soon

---

[15]     Dr. Barnes subsequently walked back his concession, denying that he considered Richardson's injury serious and reiterating his initial diagnosis that Richardson suffered only an "avulsion of the fingernail."  (Barnes Dep. at 46.)

as I said that I was going to write a statement he became very belligerent with me."  (See pages 6-7 above.)[16/]  Richardson therefore has raised a factual dispute over whether Dr. Barnes knowingly delayed the treatment of an injury that Dr. Barnes has conceded was serious in response to Richardson wishing to write a statement about his injury.

Defendants' argument that there is no evidence Dr. Barnes ignored an excessive risk to Richardson's health and safety also is based on Dr. Strauch's opinion that Dr. Barnes' treatment was "in accord with accepted standards of medical care, and any delay in his seeing the hand surgeon had no impact.  Indeed, [Richardson's] expert does not proffer an opinion to the contrary, nor does plaintiff have any cosmetic or functional deficits from the injury he suffered." (Defs. Br. at 13.)  Richardson, however, produced a detailed expert report from Dr. Brown opining that Dr. Barnes' treatment of Richardson deviated from accepted standards of medical care.  (See pages 10-12 above.)   Notwithstanding Dr. Strauch's contrary opinion (see page 13 above), Dr. Brown also opined that Richardson received inadequate pain medication for his injury (see page 11 above).  Dr. Brown further testified that Richardson's odds of a good reattachment would have been greater if Dr. Barnes had properly prepared Richardson's fingertip and identified complications that either occurred or could have occurred as result of the delay in Richardson's treatment. (See page 12 above.)  In addition, Richardson testified that he suffered loss of function in his hand due to pain for

---

[16/]     Defendants argue that Richardson "himself did not believe that he was in urgent need of transport to the hospital, as he elected to spend thirty to forty-five minutes writing an accident report when he could have been transported to Bellevue within ten minutes." (Defs. Br. at 13.)  Defendants cite no law to support the idea that a detainee's understanding of the urgency of their need for medical care is relevant to determining the state of mind of their physician.  In any event, there is evidence that Richardson was left alone in the locked holding room for twice the time it took him to write his report; although Dr. Barnes treated him for less than ten minutes and writing the report took only thirty to forty-five minutes, he was kept in the clinic for an hour and a half before being discharged.  (See pages 7-8 above.)

27

seven to eight months following his injury.  (See page 10 above.)  Moreover, as discussed in section II.B.1 above, Richardson has raised a factual dispute over whether his injuries were objectively serious.  (See pages 21-24 above.)

Accordingly, defendants' summary judgment motion on Richardson's deliberate indifference claim should be DENIED as to Dr. Barnes (and Corizon Health), but granted as to Officers Garcia and Simmons and Captain Walker.

## III.   RICHARDSON HAS PRODUCED EXPERT EVIDENCE TO SUPPORT HIS MEDICAL MALPRACTICE CLAIM

In addition to his constitutional claims, Richardson alleges that his treatment by Dr. Barnes and Corizon Health constituted medical malpractice.  (Dkt. No. 16: Am. Compl. ¶¶ 31-36.) Under New York law, establishing a claim for medical malpractice requires a plaintiff to prove "'(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.'"  Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 1995) (quoting Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994)).[17]  "Furthermore, 'it is well established in New York law that unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.'"  Zeak v. United States, 2014 WL 5324319 at *8 (quoting Sitts v. United States, 811 F.2d 736, 739 (2d Cir. 1987)); accord, e.g. Shields v. United States, 446 F. App'x 325, 326 (2d Cir. 2011); Davis v. United States, 143 F. App'x at 372; Zikianda

---

[17]   See also, e.g., Davis v. United States, 143 F. App'x 371, 372 (2d Cir. 2005); Zikianda v. Cty. of Albany, No. 12-CV-1194, 2015 WL 5510956 at *6 (N.D.N.Y. Sept. 15, 2015); Zeak v. United States, 11 Civ. 4253, 2014 WL 5324319 at *8 (S.D.N.Y. Oct. 20, 2014); Nabe v. United States, No. 10-CV-3232, 2014 WL 4678249 at *8 (E.D.N.Y. Sept. 19, 2014); Ross v. Correct Care Sols. LLC, 11 Civ. 8542, 2013 WL 5018838 at *5 (S.D.N.Y. Sept. 13, 2013).

v. Cty. of Albany, 2015 WL 5510956 at *6; Nabe v. United States, 2014 WL 4678249 at *8; Winters v. United States, 10 Civ. 7571, 2013 WL 1627950 at *7 (S.D.N.Y. Apr. 16, 2013).[18/]

To support his medical malpractice claim, Richardson has introduced expert testimony from emergency medicine specialist Dr. Kevin Brown.  (See pages 10-12 above).  Dr. Brown's report, which is based on a detailed review of Richardson's medical records, identifies five different ways in which Dr. Barnes' treatment of Richardson breached the standard of care and explains Dr. Brown's reasoning with respect to each.  (See page 11 above.)  Dr. Brown further opines that these breaches caused the long-term effects Richardson alleges, stating that the "departures from acceptable emergency care led to subsequent complications and long-term complications."  (See page 11 above.)

Defendants argue that because Dr. Brown is an emergency medicine specialist rather than a hand surgeon or plastic surgeon and "because Dr. Brown failed to set forth facts to establish that he has 'the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable,' he does not have the qualifications to offer an opinion on the appropriateness of the treatment [Richardson] received or did not receive."  (Dkt. No. 50:

---

[18/]    See also, e.g., Ford v. United States, 98 Civ. 6702, 2000 WL 1745044 at *4 (S.D.N.Y. Nov. 27, 2000); Perez v. United States, 85 F. Supp. 2d 220, 226 (S.D.N.Y. 1999), aff'd, 8 F. App'x. 48 (2d Cir. 2001); Marson v. United States, 84 Civ. 7348, 1987 WL 12407 at *7 (S.D.N.Y. June 5, 1987) ("Expert testimony is generally required to establish both that the standard of care has been violated and that this was the proximate cause of the plaintiff's injury."), aff'd, 841 F.2d 1117 (2d Cir. 1988); Rodriguez v. N.Y.C. Health & Hosp. Corp., 50 A.D.3d 464, 465, 858 N.Y.S.2d 99 (1st Dep't 2008) (expert testimony required for malpractice action based on lack of informed consent); Lyons v. McCauley, 252 A.D.2d 516, 517, 675 N.Y.S.2d 375, 376-77 (2d Dep't), appeal denied, 92 N.Y.2d 814, 681 N.Y.S.2d 475 (1998).

Defs. Br. at 17.)[19]   In response, Richardson argues:

> [T]he very nature of incarceration, and the fact that inmates can be unexpectedly injured for a variety of reasons, means that Corizon does not staff specialists, such as a hand surgeon at their jails, but general practitioners and internists, such as Dr. Barnes, whose knowledge and training would allow them to take care of a variety of injuries and treat patients with sudden, unexpected injuries and illness.  Only through proper examination and treatment at this first line of emergency treatment can it be determined if specialized care is needed.  This is the very nature of emergency medicine.  This means that the appropriate inquiry, is whether or not Dr. Barnes, when confronted with Mr. Richardson's sudden [and] unexpected injury, properly treated him within acceptable medical standards.

(Dkt. No. 55: Richardson Br. at 13-14.)

Under New York law, it is well established that "where a physician opines outside of his or her area of specialization, a foundation must be laid tending to support the reliability of the opinion rendered . . . ."  Tsimbler v. Fell, 123 A.D.3d 1009, 1009, 999 N.Y.S.2d 863, 865 (2d Dep't 2014) (collecting cases), appeal denied in part & dismissed in part, 25 N.Y.3d 1192, 16 N.Y.S.3d 50 (2015); see also, e.g., Black v. State, 125 A.D.3d 1523, 1525, 3 N.Y.S.3d 837, 839 (4th Dep't 2015); Estate of Lawler v. Mt. Sinai Med. Ctr., Inc., 115 A.D.3d 620, 621, 983 N.Y.S.2d 15, 17 (1st

---

[19]   Defendants also point to the conflicting testimony of their expert Dr. Strauch, a board certified orthopedic surgeon with a speciality in hand surgery.  (Defs. Br. at 16-17.)  Dr. Strauch opined that Richardson received precisely the correct treatment for his injuries in a timely fashion and "[n]o treatment that [Dr. Barnes] rendered or did not render in no way impacted the clinical outcome of Mr. Richardson's hand injuries.  The time it took to reach Bellevue had absolutely no bearing on Mr. Richardson's clinical result."  (See page 13 above.)

Dr. Strauch's testimony is not a basis for granting defendants summary judgment.  Under New York law, summary judgment is inappropriate in a medical malpractice action where the parties present conflicting opinions by medical experts.  See, e.g., Zikianda v. Cty. of Albany, 2015 WL 5510956 at *6; Bartholomew v. Itzkovitz, 119 A.D.3d 411, 415, 990 N.Y.S.2d 10, 13 (1st Dep't 2014); Ahmed v. Pannone, 116 A.D.3d 802, 813, 984 N.Y.S.2d 104, 113 (2d Dep't 2014), appeal dismissed, 25 N.Y.3d 964, 8 N.Y.S.3d 261 (2015); Isabelis M. v. Mudge, 119 A.D.3d 440, 440, 988 N.Y.S.2d 492, 492 (1st Dep't 2014); Moray v. City of Yonkers, 95 A.D.3d 968, 969-70, 944 N.Y.S.2d 210, 210 (2d Dep't 2012).

Dep't 2014); Martino v. Bendo, 93 A.D.3d 500, 501, 940 N.Y.S.2d 253, 254 (1st Dep't 2012); Diel v.

Bryan, 71 A.D.3d 1439, 896 N.Y.S.2d 782, 783 (4th Dep't 2010).  Nonetheless, "[a] physician need

not be a specialist in a particular field in order to qualify as a medical expert. Rather, any alleged

lack of knowledge in a particular area of expertise is a factor to be weighed by the trier of fact that

goes to the weight of the testimony."  Walsh v. Brown, 72 A.D.3d 806, 807, 898 N.Y.S.2d 250, 251

(2d Dep't 2010) (citations omitted); see also, e.g., Fuller v. Preis, 35 N.Y.2d 425, 431, 363 N.Y.S.2d

568, 574 (1974); Estate of Lawler v. Mt. Sinai Med. Ctr., Inc., 115A.D.3d at 621, 983 N.Y.S.2d at

17; Rojas v. Palese 94 A.D.3d 557, 558, 943 N.Y.S.2d 22, 23 (1st Dep't 2012); Harris v. Carella, 42

A.D.3d 915, 916, 839 N.Y.S.2d 886, 888 (4th Dep't 2007); Williams v. Halpern, 25 A.D.3d 467,

468, 808 N.Y.S.2d 68, 69 (1st Dep't 2006); Hill v. N.Y. Hosp., 277 A.D.2d 117, 118, 716 N.Y.S.2d

568, 569 (1st Dep't 2000).

        Dr. Brown's expert report discusses in detail his qualifications as an emergency

medical specialist, including teaching emergency medicine to residents, "more than forty years

caring for traumatic injuries of extremities" and experience as the "director of three emergency

departments over a ten-year period."  (See pages 10-11 above.)  Defendants have offered no case

law or argument aside from bare assertion that the proper course of treatment for Richardson's

injuries is outside Dr. Brown's area of specialization and no explanation why, even if it were, the

Court should not consider his extensive qualifications sufficient foundation to make any alleged lack

of expertise an issue to be weighed by the jury.  (See Defs. Br. at 16-17.)

        Defendants further argue that Richardson has failed to show any causal connection

between Dr. Barnes' alleged professional negligence and any injuries he suffered because "Dr.

Brown's expert report is devoid of any opinion that the purported delay in transporting [Richardson]

to the hospital caused any condition, deficit or disfigurement.  In the absence of proof that the

claimed departure from a standard of care has a nexus with [Richardson's] claimed injury, the claim for medical malpractice fails."  (Defs. Br. at 17; see also Dkt. No. 59: Defs. Reply Br. at 8-9.)

       This argument is unpersuasive because it misstates Dr. Brown's expert report and ignores his deposition testimony.  In his report, Dr. Brown opined that Dr. Barnes' deviations from the accepted standard of care "led to subsequent complications and long-term complications," and specifically identified the delay in treatment as one of Dr. Barnes' deviations.  (See page 11 above.) Dr. Brown testified to causal connections between Dr. Barnes' treatment and subsequent complications for Richardson.  Specifically, Dr. Brown testified that a fingertip amputation is "a time-sensitive injury," that Dr. Barnes failed to properly prepare  Richardson's severed fingertip or send him to Bellevue "in a timely fashion," and that for an amputated fingertip, the window for reattachment normally is one to two hours.  (See page 12 above.)  He further testified that had the cap graft Richardson ultimately received taken, Richardson probably would have had improved sensation post-recovery.  (See page 12 above.)  Similarly, Dr. Brown identified ischemia (i.e., decreased blood flow) as one complication that occurred along with pain and infections as other potential complications.  (See page 12 above.)   His testimony is consistent with Richardson's deposition testimony regarding his subsequent infections and severe pain and with Bellevue records that show Richardson experienced ischemia.  (See pages 9-10 above.)[20]

---

[20]    Defendants cite Watson-Tobah v. Royal Moving & Storage, Inc., 13 Civ. 7483, 2014 WL 6865713 at *13-14 (S.D.N.Y. Dec. 5, 2014) (collecting cases), to argue that Dr. Brown's opinions should be discounted because they are conclusory.  (Defs. Reply Br. at 8-9.)  In Watson-Tobah, the district court rejected a medical expert's opinion in an automobile accident case because it inaccurately described the plaintiff's medical history by failing to even mention the plaintiff's prior, recent automobile accidents or explain how the expert concluded that the accident at issue caused the plaintiff's injuries.  At deposition, however, Dr. Brown stated that while he could not entirely rule out malpractice at Bellevue as a potential cause, he did not see any reason to blame them and knew that "clearly there was (continued...)

Accordingly, defendants' motion for summary judgment should be <u>DENIED</u> as to Richardson's malpractice claim against Dr. Barnes and Corizon.

## IV.   DEFENDANTS SHOULD NOT BE GRANTED SUMMARY JUDGMENT ON RICHARDSON'S NEGLIGENCE CLAIM AGAINST OFFICERS SIMMONS AND GARCIA

Richardson claims that the defendants were negligent by "not properly performing their duties, by not being at their correct posts, by negligently closing a cell door, by denying him access to adequate medical care, failing to provide medical treatment, and/or otherwise neglecting his medical needs." (Dkt. No. 16: Am. Compl. ¶¶ 54-59.)[21] "'Summary judgment is difficult to obtain in negligence actions because whether conduct is "negligent" is a factual determination in all but the most extreme situations.'" <u>Bale</u> v. <u>Nastasi</u>, 982 F. Supp. 2d 250, 255 (S.D.N.Y. 2013).[22]

"'Under New York law, the elements of a negligence claim are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach.'" <u>Gray</u> v. <u>Denny's Corp.</u>, 535 F. App'x 14, 15 (2d Cir. 2013) (quoting <u>Lombard</u> v. <u>Booz-</u>

---

[20]   (...continued)
a delay in transporting [Richardson] to the hospital and a delay . . . or an inadequate preparation of the fingertip." (<u>See</u> page 12 above.)

[21]   Richardson's negligence claim against Dr. Barnes and Corizon Health (Am. Compl. ¶¶ 56-58) should be dismissed as duplicative of his medical malpractice claim. <u>See</u> <u>La Russo</u> v. <u>St. George's Univ. Sch. of Med.</u>, 747 F.3d 90, 101 (2d Cir. 2014) (district court's dismissal of the plaintiffs negligence claims affirmed because they were "substantially related to medical treatment and as such, are duplicative of the medical malpractice claims.").

[22]   See also, e.g., Rodriguez v. City of N.Y., No. 13-CV-327, 2015 WL 4078618 at *4 (E.D.N.Y. July 6, 2015); Deykina v. Chattin, No. 12-CV-2678, 2014 WL 4628692 at *5 (E.D.N.Y. Sept. 15, 2014); RJ Capital, S.A. v. Lexington Capital Funding III, Ltd., 10 Civ. 25, 2013 WL 1294515 at *13 (S.D.N.Y. Mar. 30, 2013).

Allen & Hamilton, Inc., 280 F. 3d 209, 215 (2d Cir. 2002)).[23]

In New York, "a correctional facility 'owes a duty of care to safeguard inmates.'" Qin Chen v. United States, 494 F. App'x at 109.[24] "This does not, however, render a correctional facility an insurer of inmate safety." Qin Chen v. United States, 494 F. App'x at 109 (quotation omitted). Rather, "[t]he scope of the duty is 'limited to risks of harm that are reasonably foreseeable.' Foreseeability is defined by actual or constructive notice." Id. (citation omitted).

Richardson has introduced evidence that correction officers had actual notice of inmates being injured by cell doors, established a protocol to prevent such injuries, and disregarded that protocol in this case. Captain Walker testified that MDC has policies and procedures in place for how to respond when an inmate "gets his hand stuck in the slider" and that this kind of accident has happened before. (See page 4 n.2 above.) Captain Walker and C.O. Garcia both described the facility's normal procedure as requiring one of the guards to announce the opening and closing of cell doors to inmates. (See pages 3-4 above.) Richardson also introduced evidence that C.O. Simmons and C.O. Garcia did not follow MDC procedure. C.O. Garcia testified only that he called out the names of the inmates who had made bail. (See pages 3-4 above.) Moreover, by the time he was calling out the names of the three inmates who had made bail, the door to Richardson's cell already was being opened. (See page 4 above.) C.O. Garcia claimed that he did not know who told

---

[23]   Accord, e.g., Qin Chen v. United States, 494 F. App'x 108, 109 (2d Cir. 2012);  Abdel-Karim v. EgyptAir Airlines, 12 Civ. 5614, --- F. Supp. 3d. ----, 2015 WL 4597555 at *14 (S.D.N.Y. July 31, 2015); Dershowitz v. United States, 12 Civ. 8634, 2015 WL 1573321 at *23 (S.D.N.Y. Apr. 8, 2015).

[24]   See also, e.g., Young v. Tryon, No. 12-CV-6251, 2015 WL 309431 at *9 (W.D.N.Y. Jan. 23, 2015), report & rec. adopted, 2015 WL 554802 (W.D.N.Y. Feb. 11, 2015); Kovalchik v. City of N.Y., 09 Civ. 4546, 2014 WL 4652478 at *9 (S.D.N.Y. Sept. 18, 2014); Chen Chao v. Holder, No. 10-CV-2432, 2013 WL 4458998 at *5 (E.D.N.Y. Aug. 16, 2013).

Officer Simmons to open the cell doors, even though under MDC procedures he should have been the officer to do so.  (See page 4 above.)  An inmate witness stated that he saw Officer Simmons repeatedly open and close Richardson's cell door to get Richardson's attention.  (See page 4 above.)

Defendants, however, argue that Richardson "has not alleged any facts to support a claim that the DOC or its employees breached a duty of care to him" because "he was aware of how the cell door operated prior to this incident" and "testified that, at the time of the incident, the door operated in the same manner" he previously observed.  (Dkt. No. 50: Defs. Br. at 17-18.)  Therefore, in defendants' view, "the sole proximate cause of the accident to [Richardson's] hand was his failure to remove it from the moving door, not the correction officer's act in opening it."  (Defs. Br. at 18.)

Under New York law, although proximate, i.e., legal, cause is "'ordinarily for the trier of fact to determine . . . where only one conclusion may be drawn from the established facts the question of legal cause may be decided as a matter of law.'"  Diaz v. Calabrese, No. 13-CV-1531, 2014 WL 6883517 at *11 (E.D.N.Y. Dec. 4, 2014) (quoting Howard v. Poseidon Pools, Inc., 72 N.Y.2d 972, 974, 534 N.Y.S.2d 360, 361 (1988)); see also, e.g., Voss v. Netherlands Ins. Co., 22 N.Y.3d 728, 737, 985 N.Y.S.2d 448, 454 (2014).  Defendants are correct that Richardson admitted to knowing how his cell door operated and to placing his hand on the door.  (See page 3 above.)  Richardson, however, also testified that when the door to his cell opened the third time, he thought the door would "open and close like the first two times," but instead it continued to open all the way, resulting in the injury to his finger.  (See pages 4-5 above.)  Moreover, although Richardson admitted that he does not actually know how his finger slid with the door, he also testified that "[i]t happened just so fast that soon as it began to open, I felt that my finger was being pulled with it and, you know, pain just came out of nowhere, and I began pulling my hand out and it continued to . . . . open as I'm pulling my finger out."  (See page 5 above.)  Based on Richardson's testimony, there

is a factual dispute over whether he had any reason to believe the door would open all the way if it opened again unexpectedly and whether he had time to remove his hand before it was injured by C.O. Simmons' repeatedly opening and closing the cell door to get his attention.[25]

Accordingly, defendants' summary judgment motion as to Richardson's negligence claims against C.O. Simmons and C.O. Garcia should be DENIED.  The negligence claim against Captain Walker should be dismissed; Richardson has not produced any evidence that Captain Walker, who did not arrive until after Richardson's injury, had any involvement with the door closing incident.  The negligence claim against Dr. Barnes sand Corizon should be dismissed as duplicative of the medical malpractice claim.

## V.   RICHARDSON'S CLAIMS AGAINST CORIZON AND THE CITY OF NEW YORK FOR NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION SHOULD BE DISMISSED BECAUSE THE INDIVIDUAL DEFENDANTS WERE ACTING WITHIN THE SCOPE OF THEIR EMPLOYMENT

Richardson asserts that Corizon was negligent in its hiring, retention, training and supervision of Dr. Barnes (Dkt. No. 16: Am. Compl. ¶¶ 47-50), and that DOC was negligent in its hiring, retention, training and supervision of Captain Walker and Officers Simmons and Garcia (Am.

---

[25]    Furthermore, the only case defendants cite in support of their argument that Richardson is the sole proximate cause of his own injury is Harding v. City & Cty. of San Francisco, 602 F. App'x 380 (9th Cir. 2015), in which the Ninth Circuit affirmed summary judgment dismissing an inmate's negligence claim against a guard after the inmate suffered a severed fingertip during a routine pat-down search after placing her hand on a door frame.  The Ninth Circuit noted that "the record is undisputed that Deputy Young had no notice that the door that slammed on Appellant's finger was broken or otherwise posed a dangerous condition, therefore, Deputy Young had no duty to ensure that Appellant did not place her own finger in the door frame. In fact, it was Appellant's own conduct that caused the injury, as Appellant testified that she knew the door posed a danger, but nevertheless placed her finger in the frame." Harding v. City & Cty. of San Francisco, 602 F. App'x at 383.  Here, however, Richardson has introduced evidence that the officers at MDC were on notice that the automatic door system posed a danger to inmates' safety and did not follow their own safety procedures.  (See page 3-4, 4 n.2 above.)

Compl. ¶¶ 51-53).  Defendants seek summary judgment on both claims.  (Dkt. No. 50: Defs. Br. at 19.)

Under New York law, "a claim for negligent hiring or retention 'can only proceed against an employer for an employee acting outside the scope of [his] employment.'"  Peterec v. Hilliard, 12 Civ. 3944, 2013 WL 5178328 at *13 (S.D.N.Y. Sept. 16, 2013) (quoting Newton v. City of N.Y., 681 F. Supp. 2d 473, 488 (S.D.N.Y. 2010)); accord, e.g., Schoolcraft v. City of N.Y., 10 Civ. 6005, --- F. Supp. 3d ----, 2015 WL 2070187 at *50 (S.D.N.Y. May 5, 2015) (collecting cases), reconsidered in part on other grounds, 2015 WL 5542770 (S.D.N.Y. Sept. 18, 2015); Hayes v. City of N.Y., 12 Civ. 4370, 2014 WL 4626071 at *11 (S.D.N.Y. Sept. 15, 2014) (Kaplan, D.J.).  "'Generally, where an employee is acting within the scope of his or her employment, the employer is liable for the employee's negligence under a theory of respondeat superior and no claim may proceed against the employer for negligent hiring, retention, supervision or training.'"  Timothy Mc. v. Beacon City Sch. Dist., 127 A.D.3d 826, 829, 7 N.Y.S.3d 348, 351 (2d Dep't 2015) (quoting Talavera v. Arbit, 18 A.D.3d 738, 738, 795 N.Y.S.2d 708, 709 (2d Dep't 2005)).[26]  It is undisputed that Dr. Barnes was an employee of Corizon, that C.O. Simmons, C.O. Garcia and Captain Walker were employees of DOC, and that they all were acting within the scope of their employment.  (See generally Dkt. No. 55: Richardson Br.; Dkt. No. 56: Richardson 56.1 Stmt.)  Richardson does not contest this point in his brief opposing summary judgment, arguing only that each of the individual defendants was negligent.  (See Richardson Br. at 15-16.)

---

[26]    See also, e.g., Peterec v. Hilliard, 2013 WL 5178328 at *13; Spear v. City of Buffalo, No. 11-CV-00012A, 2014 WL 1053987 at *12 (W.D.N.Y. Mar. 18, 2014), report & rec. adopted, 2014 WL 1347759 (W.D.N.Y. Apr. 4, 2014); Saretto v. Panos, 120 A.D.3d 786, 788, 992 N.Y.S.2d 88, 90 (2d Dep't 2014); Chavez v. City of N.Y., 99 A.D.3d 614, 614, 953 N.Y.S.2d 33, 34 (1st Dep't 2012); Gray v. Schenectady City Sch. Dist., 86 A.D.3d 771, 773-74, 927 N.Y.S.2d 442, 446 (1st Dep't 2011).

Moreover, under New York law, to state a claim for negligent hiring, training, supervision or retention, "in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (citations & quotations omitted).[27/] "A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee." Bouchard v. N.Y. Archdiocese, 719 F. Supp. 2d 255, 261 (S.D.N.Y. 2010) (citations & quotations omitted), appeal dismissed, 458 F. App'x 37 (2d Cir. 2012).[28/]

Richardson argues that Captain Walker improperly handled MDC's response to Richardson's injury by not asking Officers Simmons or Garcia if MDC protocol was followed and by ordering C.O. Garcia to issue Richardson an infraction for obstructing the cell door "without speaking to anyone with knowledge of what happened." (Richardson Br. at 16.)  Nonetheless, Richardson has produced no evidence that the individual defendants had any propensity for the conduct that caused Richardson's injury or that the City, DOC or Corizon failed to investigate any

---

[27/]    Accord, e.g., Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 94 (2d Cir. 2011); Doe v. Montefiore Med. Ctr., 598 F. App'x 42, 43 (2d Cir. 2015); Nelson v. Selfhelp Cmty. Servs., Inc., 13 Civ. 5524, 2014 WL 6850967 at *3 (S.D.N.Y. Dec. 4, 2014); Jimenez v. City of N.Y., 14 Civ. 2994, 2014 WL 5089392 at *4 (S.D.N.Y. Oct. 9, 2014); Tsesarskaya v. City of N.Y., 843 F. Supp. 2d 446, 463-64 (S.D.N.Y. 2012) (Peck, M.J.); Romano v. SLS Residential, Inc., 812 F. Supp. 2d 282, 295 (S.D.N.Y. June 2011).

[28/]    See also, e.g., Nelson v. Selfhelp Cmty. Servs., Inc., 2014 WL 6850967 at *3; Jimenez v. City of N.Y., 2014 WL 5089392 at *4; Tsesarskaya v. City of N.Y., 843 F. Supp. 2d at 464.

of the individual defendants when they were prospective employees or had any knowledge of facts that would lead a reasonably prudent person to investigate them.  (See generally Richardson Br.; Dkt. No. 56: Richardson 56.1 Stmt.)

Summary judgment is appropriate when there is no proof that the employer (here, DOC or Corizon) acted negligently in hiring, training, supervising or retaining an employee.  See, e.g., Tsesarskaya v. City of N.Y., 843 F. Supp. 2d at 464; Hattar v. Carelli, 09 Civ. 4642, 2012 WL 246668 at *5 (S.D.N.Y. Jan. 11, 2012); Biggs v. City of N.Y., 08 Civ. 8123, 2010 WL 4628360 at *9 (S.D.N.Y. Nov. 16, 2010); Bouchard v. N.Y. Archdiocese, 719 F. Supp. 2d at 263; Tatum v. City of N.Y., 06 Civ. 4290, 2009 WL 124881 at * 10 (S.D.N.Y. Jan. 20, 2009), reconsideration denied, 2009 WL 976840 (S.D.N.Y. Apr. 9, 2009).

Accordingly, defendants should be granted summary judgment as to Richardson's negligent hiring, training and retention claims.

## VI.   RICHARDSON'S REMAINING CLAIMS SHOULD BE DISMISSED BECAUSE HE CANNOT PREVAIL ON THEM AS A MATTER OF LAW

Richardson's third, fourth, and eighth causes of action assert claims for intentional and negligent infliction of emotional distress and violation of Article I, § 12 of the New York State constitution.  (Dkt. No. 16: Am. Compl. ¶¶ 37-45, 60-65.)  Defendants have moved for summary judgment "dismissing the Amended Complaint and action in its entirety" (Dkt. No. 45: Summary Judgment Motion at 1), but their brief presents no argument with respect to these claims (see generally Dkt. No. 50: Defs. Br.).  Nonetheless, because Richardson cannot prevail on these claims as a matter of law for the reasons discussed below, they should be dismissed.

### A.   Richardson's Emotional Distress Claims Should Be Dismissed Because They Are Based On Conduct That Is Embraced By Traditional Tort Remedies

"New York law explicitly bars recovery for negligent or intentional infliction of

emotional distress when such claims are based on conduct that is 'embraced by a traditional tort remedy.'"   Poulos v. City of N.Y., 14 Civ. 3023, 2015 WL 5707496 at *10 (S.D.N.Y. Sept. 29, 2015).[29/]   Richardson's claims for intentional and negligent infliction of emotional distress are based on the same conduct giving rise to his state law claims for negligence and medical malpractice. (See Dkt. No. 16: Am. Compl. ¶¶ 37-45.)   Thus, because traditional tort remedies are available to address Richardson's injuries, his intentional and negligent infliction of emotion distress claims should be dismissed.

### B.   Richardson's Claim That Defendants Violated New York State Constitution Article I, Section 12 Should Be Dismissed Because An Alternative Remedy Exists

Under New York law, there is no private right of action for a violation of the New York State Constitution where an alternative remedy exists.   See, e.g., Gustafson v. Vill. of Fairport, No. 12-CV-6147, 2015 WL 3439241 at *8 (W.D.N.Y. May 29, 2015); Corbett v. City of N.Y., No. 11-CV-3549, 2013 WL 5366397 at *24 (E.D.N.Y. Sept. 24, 2013); Liang v. City of N.Y., No. 10-CV-3089, 2013 WL 5366394 at *18 (E.D.N.Y. Sept. 24, 2013); Lozada v. City of N.Y., No. 12 Civ. 0038, 2013 WL 3934998 at *4 n.7 (E.D.N.Y. July 29, 2013); Malay v. City of Syracuse, 638 F. Supp. 2d 303, 315-16 (N.D.N.Y. 2009); Singh v. City of N.Y., 418 F. Supp. 2d 390, 406 (S.D.N.Y. 2005), aff'd, 524 F.3d 361 (2d Cir. 2008); Martinez v. Sanders, 02 Civ. 5624, 2004 WL 1234041 at *6 (S.D.N.Y. June 3, 2004) (collecting cases), aff'd, 307 F. App'x 467 (2d Cir. 2008).   Richardson's claim under Article I, § 12 of the New York State Constitution is based on deliberate indifference

---

[29/]   See also, e.g., Bouveng v. NYG Capital LLC, 14 Civ. 5474, 2015 WL 3503947 at *14 (S.D.N.Y. June 2, 2015); Lovitch v. Lovitch, 11 Civ. 2536, 2015 WL 1047807 at *9 n.8 (S.D.N.Y. Mar. 10, 2015); Light v. W2001 Metro. Hotel Realty LLC, 10 Civ. 4449, 2011 WL 2175778 at *4 (S.D.N.Y. June 2, 2011); Druschke v. Banana Republic, Inc., 359 F. Supp. 2d 308, 315-16 (S.D.N.Y. 2005).

to his medical needs and negligence.  (Dkt. No. 16: Am. Compl. ¶ 61.)  Because Richardson's state

constitutional claim is identical to his federal § 1983 deliberate indifference claim and his state law

malpractice and negligence claims, he clearly has alternative remedies available.  Richardson's state

constitutional claim therefore should be dismissed.

## CONCLUSION

For the reasons set forth below, defendants' motion (Dkt. No. 45) should be

DENIED with respect to Richardson's § 1983 deliberate indifference claim against Dr. Barnes and

Corizon, his medical malpractice claim, and his negligence claim against Officers Garcia and

Simmons, but GRANTED in all other respects.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be

filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable

Lewis A. Kaplan, 500 Pearl Street, Room 2240, and to my chambers, 500 Pearl Street, Room 1370.

Any requests for an extension of time for filing objections must be directed to Judge Kaplan (with

a courtesy copy to my chambers).   Failure to file objections will result in a waiver of those

objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v.

Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d

1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Frank v. Johnson, 968

F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health

& Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:       New York, New York
             November 18, 2015

                                    Respectfully submitted,


                                    _____
                                    **Andrew J. Peck**
                                    United States Magistrate Judge


Copies ECF to:      All Counsel
                    Judge Kaplan